May it please the court, I was appointed to represent the defendant in this case on this appeal. I did not try the case, nor was I the initial counsel on appeal. The court very much appreciates your assistance. Thank you. This was a trial in the Western District for distribution, I believe, of methamphetamine. At the end of the trial, he was found guilty of the counts that he was charged with and sentenced to a guideline range. It was the bottom of the guideline range, but it was a guideline range of 360 months, so basically 30 years. Two issues are raised on appeal. One has to do with the prejudicial statement that was just uttered or said by a government witness, Kevin Weiss. Basically, this was a historical conspiracy. There were some tapes, some wires where there's that kind of information, but there were no real drug seized or controlled drug buys. It was primarily people who were charged in the indictment and for whatever reason were cooperating to get their own sentence lower and made statements basically against the defendant and estimated the amounts of drugs that they bought from him and talked about his dealings. One of those witnesses was a Kevin Weiss, and during the course of his direct testimony with the government, he said he knew the defendant by his nickname of Hoodnut, and I think it was at that point or right after that, the defense objected because he knew what was possibly coming next. They knew that he had said apparently in proffers and with the meetings with the government that he knew that was the defendant, that was his nickname because his friend Stephen Fine told him that he killed Stephen Fine. Let me back that up. Stephen Fine told him that Hoodnut killed his, I think it was cousin. Yeah. So anyway, the defense objects because he's afraid he's going to say that next. Actually, the court cut the witness off before the objection. Well, that came later. There's a defense objection, and they said, well, he hasn't said anything, and he said, well, no, I was just ahead of myself, and then they went back into open court, and then he immediately blurted it out almost immediately, and then the judge, yeah, the judge stopped it immediately, and there was this big discussion at the bench about, you know, first they asked for mistrial. That was denied. Then there was a discussion at the bench basically about what to do and the curative instruction, and the government didn't want him to take a recess, didn't want to highlight it, and then the judge and the government basically were mistaken and said, well, he really didn't say Hoodnut killed him. There was a lot of pronouns, and so he really didn't specifically point out your client as the one that committed the murder, and the defendant's counsel said, well, okay, I don't think he knew exactly, and they went back, gave the curative instruction, and went back into the courtroom. A few minutes later, the judge stopped it again because apparently the courtroom deputy, and I'm not sure the government could because I wasn't there, but apparently they gave the transcript or that portion of the transcript to the judge. He showed the judge he was wrong, and he actually did say Hoodnut committed this murder. Again, there was a request for a mistrial because that's highly prejudicial, and apparently there were some tapes that were played for the jury that indicated that during the course of Mr. Ubarra's drug trafficking there was some violence, not murder, but there was some violence, and that in combination with this statement, the defendant's argument was prejudicial and requested a mistrial, and that was completely denied. Nothing was ever said more to the jury, and the case just proceeded on. That's the first issue we raise on appeal. The second issue has to do with a government witness against Samantha Edmonds. Just to clarify and make sure I understand, the jury didn't hear any of this confusion about the pronouns. What the jury heard was they heard the outburst and the judge's reaction on the bench conference. Then there's a curative instruction, and then there's another interruption, but nothing further. The jury doesn't hear the additional colloquy, and the curative has not changed. Have I got that right? I believe that's correct. He was at the bench, and so they wouldn't have heard it. But the argument basically is the judge was wrong when he made the curative instruction. Well, when he made the curative instruction, he was relying on misinformation because he thought that there was never a direct statement that Hood not committed this murder, where, in fact, there was. But even based on— Is there anything in the record that the witness was instructed not to say anything about this, given the fact that defense counsel anticipated the problem and made an objection even before the statement was made? Is there anything in the record about motion in limine or any admonition to the witness not to say anything? I don't think there was a specific motion filed. It's my recollection. But I think the government indicated they had talked with him prior to testifying, and they assured the court when they went back in after the curative instruction was given that he would not say this again. But I don't think there was a recess where they talked to him. The government can clear that up. That obviously was their witness. On Samantha Evans, she was, again, a witness about historical conspiracy, historical amounts. And her boyfriend—Damon, I believe his name was— was the one that was buying drugs from defendant. She said she was with him. Damon Schultz was with him one time when he bought these drugs. And then she testified that her boyfriend, Damon, sold a lot of drugs and he got all his drugs from defendant. And so that just increased the drug quantity put on the defendant. When, in fact, in her first statement, that was on a videotape, when she was first interviewed by the police or during her proffers, she said that his main—Damon's main suppliers were two individuals named Taco and Beto. And when asked about that on cross-examination, the defendant asked, weren't your two suppliers not the defendant but these two people, or Damon's two suppliers? She denied that. Also, she did not testify, I don't believe, on direct— or, I mean, I'm sorry, she did not tell the officers in her videotape statement that she had gone with Damon when he purchased drugs roughly from defendant, but she testified to that on direct. The defendant's attorney cross-examined her based on some summary that he had, but he reserved the right to recall her in the defense portion of the case. So after the government arrested, he had the videotape— The summary is or isn't on the record? It's not. And I don't know why he didn't have the videotape at the time. I have no idea why he didn't use it then. But after the government arrested, he requested her to be recalled, and he wanted to, again, cross-examine her on just these two issues and play a portion of her videotape statement where she gave a statement prior directly contradictory to her trial testimony. He said it was about three minutes at the most long. The government didn't object, but the court didn't allow him to do it. He said he had ample time to do it and that he could use a summary, or he used a summary. But the bottom line is, he said you've got to ask her the same questions based on your summary. That's true he did, but she denied him. And the tape would show that that's what she said, where in her direct testimony she denied him her making that statement. So in this case, the videotape statement was the best evidence of what— her credibility is basically what it is. And when she's testifying to events that occurred that are historical, there's nothing backing it up, and there's no drugs they could— this is the drugs we bought that day. Her credibility is extremely important. And the government had no objection. They just wanted to make sure that there was time during the lunch recess that she could watch the videotape and refresh her recollection, which they had no argument with. But the court denied it and said you had plenty of time. We're moving on and wouldn't let him call her back. And we're alleging he has a denial of his right to confrontation. And that's all I have unless you have questions. Very good. Thank you. Judge, as you noted, my name is Bruce Rhodes. I'm not only appellate counsel, but I was trial counsel. I'm not sure if that's going to help me or hurt me. And not only that, Judge, I was not only trial counsel, I was also counsel for the trial in the case from the get-go. And so I can answer the court's question about whether or not Mr. Weiss was counseled about that statement. Candidly, I am unaware of anybody ever talking to Mr. Weiss specifically about You shouldn't say that because I have no recollection of that ever being said by Mr. Weiss before he said it in trial in a non-response to a question or in a response that was non-responsive to the question I asked. With respect to Mr. Wellicke, trial counsel's objection, initial objection, the record's very clear, and I would refer you to, I think, page 21 of my brief. But the record is very clear that the court actually asked Mr. Wellicke, was that what you were objecting to the first time? He says, no, no, not really. So Mr. Wellicke was not thinking that Mr. Weiss was going to say, yeah, I know that guy is hoodnut because Stephen Fine told me he killed his cousin. That's not what Mr. Wellicke was objecting to. What he was objecting to was the hearsay that he thought was coming. And so Mr. Wellicke told the court at the time, I was not expecting that statement. That's not what I was objecting to. Now, the question also from the court, from this court, was about the jury, where the jury was. And so the scenario of events is that I'm questioning Mr. Weiss about how he knows, because he doesn't know hoodnuts as Travis Jabbar. He knows him as hoodnut. He knows that individual. He can pick him out of a lineup, but he only knows him as hoodnut. And it wasn't until the indictment came out that he knew that hoodnut's name was actually Travis Jabbar. So we're going through a series of questions about that, and that's how the initial objection came up was because I was candidly, my questions were listening to some hearsay. And while there is some hearsay exceptions for background and for identity and those kinds of things and conspiracy and this kind of stuff, and while that technique was probably during the conspiracy, I could also understand why somebody would be objecting and saying, look, you're listening to hearsay. And then, of course, in continuing to try to get that identification, I get this statement that I wasn't prepared for or anticipated. I recognize that Mr. Wellicke did, if he knew about the statement, which he never claimed in the record that he knew about the statement, he did not file a motion to eliminate. I'm not candidly, judges, I'm not really sure if that's on him or not. I think it's reasonable for the defense to have assumed that we weren't going to elicit that information if he knew about it. I don't, as I stand here and as I've written this appeal and when the trial was going on, never remembered this ever being information that I was aware of. I'm not using it as a defense. I'm just saying that's the facts. So, anyway, I get the initial objection. The judge overrules that. We then go back, and I think it's the next question or maybe the second question, and then the judge, Judge Case, object or hold on, hold on, hold on. He stops him. He cuts him off. Mr. Wellicke and I walk up there. We have the soliloquy that's in the record that's in both the briefs, and then the judge gives a curative instruction. I do agree that, and I don't remember which one of you brought up about the pronoun thing. That actually went on. I candidly have to admit that I agreed with the judge. In fact, I may have actually suggested to the judge that I thought it was a pronoun. This is from the trial lawyer who is using the term hoodnut regularly during the case, and that's what I thought the record said. The judge makes his ruling. We go back. This is like two minutes into Mr. Weiss's testimony. We go back and spend another 28 minutes or so. These are rough numbers. There's approximately 30 minutes of testimony. And then Mr. Wellicke cross-examines him, et cetera. We finish. At some point, there's a recess. I don't remember what the recess was for, but it wasn't related to this at all. It was just a regular recess. And when we came back from the recess, Judge Case came out and said, I need to explain something on the record, is that I've gone back and listened to the record and read the record. Judge Case has, I think they call it real time, where it comes up. He does that during the trial. I am not aware of why he did not do that before he ruled. I'm not blaming him. I'm the one that suggested it was a pronoun, so I'm not trying to throw stones at Judge Case. However, he's the one that came out and said, hey, I've reviewed the record, and while it was not pronouns, it actually was hood and nut, my ruling stays the same. Mr. Wellicke renewed his motion. It was denied. And we went on. There was no other accurate instruction. To answer your question, Judge Loken, no. The jury could not hear any of this. None of this was done in front of the jury. The second issue. And the text of the curative that wasn't changed did not reference the pronouns? No. He didn't ever reference the actual statement. So he didn't have to change them? No, he didn't actually reference the statement. He just said, you should ignore the last statement of the witness. It's stricken from the record. It's quoted in my brief. I don't remember the exact words, but it's something like that. He didn't reference it. But more importantly to me, and what I guess is I find more important, is the fact that when it occurred in the testimony of Mr. Weiss, and also the fact that Mr. Weiss was one of 15 witnesses, and while Ms. Hunt is correct that this was a historical conspiracy case, there was actually more than just folks coming in and talking about their activity and their knowledge. We did a search warrant of Mr. Ybarra's house. We recovered guns and money counters and drug paraphernalia there. The significance of the money counters is that we found three of them in the case, all at different locations. None of them were businesses that operated, all the same brand. There were drugs recovered from co-conspirators, direct co-conspirators that were tied directly to Mr. Ybarra. So there is candidly overwhelming evidence of guilt. And in this four-day trial, this was a miniature issue that I can't get away from because it happened, and I recognize the significance of it, and I don't deny that it was prejudicial. But it was not prejudicial of such a degree that it would require a mistrial, which is, as this court knows, is a very drastic measure. And so that's the gist of our response to that issue. With respect to Ms. Edmonds, candidly, two things, I guess. The first would be the fact that Mr. Welleke did have the video. He did not have a transcript of the video. Candidly, this was Mr. Welleke's continuing comment during the trial was that he didn't like the way that the government had provided the discovery to him. He didn't like the fact that the government had given him video but not a transcript. We're under no obligation to give him a transcript. If we had one prepared, he would have been entitled to it. We didn't have a transcript prepared of it. He had it. He was clearly aware of it. He had multiple opportunities. There's, I think, eight pages in the transcript of his cross-examination of this witness. Not only that, but he talked about these exact issues. And so there to say that, again, that he was somehow prejudiced, I don't believe there was prejudice there. What do you say to the argument that she denied making that statement  Well, she was questioned about it more than once about it. Well, that doesn't make any difference. It only compounds it if she denies it more than once. Well, I guess my point, Judge, is that the way that the record reads and the way that it felt at the time was that she, while she denied the comments of the questions of the lawyer, it felt like in the courtroom, and the record reads this way, the lawyer clearly was talking about things that were on a video. And, candidly, the reason I think that there's no prejudice is because I've got to believe that the jury felt the same way that everybody else in the courtroom did, which was that it appears that this witness is denying something she said before. Because she had earlier in direct testimony said some things, and then he questioned her about it, and she admitted that she had testified either incorrectly or had testified differently or given a statement differently. So while she may have technically or she may have actually denied that one little thing, it was of such a character that it appeared that he was talking about something that, you know, I've got proof of this right here, and you're still denying it. So the impact was the same, is my point, Judge. But under the rules of evidence, he should have been allowed to present it, though, shouldn't he? I think, Judge, he had the right to present it at the time that she was on the stand. I do not agree that he had a right to recall her to redo something that he had already done or had an opportunity to do. That's my position, and that's where I think the law should be and where I think the case law indicates. I don't dispute at the time it occurred when she was originally on the stand that he had a right to use the video. He did. But he chose not to. That's a choice he made. He had the video. I don't want to get too much into the weeds, but if you have a video that shows a prior inconsistent statement, you confront the witness with it, ask the witness about it, do you even need to recall the witness to get the video into evidence? I think he could have just put it into evidence. I think, Judge, candid Judge, I don't know the answer. But what I do know is in that courtroom on that day, he would have been able to put that video in or play the video right then to challenge her. But he chose not to do it. I don't know why, and to do it later. It wasn't because he didn't have the video. It was very clear he had the video. I see that I'm down to about four minutes. Let me just – I'm sorry, Judge. My sense from the briefs, and I want to make sure this is right, is that the inconsistency was as to Taco and Beta, specifics of other suppliers of, is it, Schultz. Correct. But she did not deny that Schultz had other suppliers than Hudson. She did not deny that Schultz got dope other places. Now, I don't remember exactly how she said it, Judge, but she did, and she also did not deny that she had not mentioned Ybarra's name or Hoodnut's name when talking about it. But to that point, Judge, is really not an answer to your question, but for my purposes to make this point is that the other evidence in the case was overwhelming that Ybarra had supplied Schultz, and that was the point that Welleke was trying to make at trial was that she was making this up now that Ybarra was Schultz's source when we had a recorded phone call between the three of them in the jail on a recorded phone line, not our wire tap, I mean a jail call where everybody on the phone call knows it's being recorded, talking about sourcing Schultz and Ybarra actually saying, you know, be careful about what you're saying, and then all the other testimony in the trial about Schultz's source being Ybarra. If there's no other questions, that's all I have. Thank you. Apparently the bench conference regarding the Hoodnut killed my cousin, the creative instruction, that ended at transcript page 454, and then the creative instruction was given at that point, and they returned to trial. Then the next bench conference when they talked about the judge called it basically on his own motion because he somehow got the transcript or whatever and realized they'd made a mistake, that bench conference ended at page 466. So it was about 12 pages later, which I don't think would be 28 minutes. I think it would be not that long. Just to clear that up. The second argument, the government argued today they were opposed to recalling. He didn't have the right to recall. Well, they agreed to it at the time. They had no problem with him being recalled, so he's changed his position today apparently. And what he wanted to put in, and I misspoke, it was a minute and 30 seconds of tape. It wasn't very long. And he just wanted to put in, because on cross-examination, she denied saying Damon Schultz had two different suppliers, Taco and Beto. That's at page 67. She also insisted she told law enforcement during her interview that Damon got his meth from Defendant. That's page 67. And she admitted she failed to tell law enforcement during her interview that she went with Damon to get meth one time. That's on page 68. Those are the three statements that basically her videotape would contradict. And that's why he wanted to put it in, and apparently it was a very short portion of the videotape. As to why he waited until the end of the case and not did it at the time that she testified, I can't answer that question. But the government at the time said we don't object to this judge. It was the judge that basically wouldn't allow it. That's all I have. Thank you. Very good.